UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 09-2499(DSD/AJB)

Patrick Dinsmore,

                Plaintiff,

v.                                                    **ORDER**

U.S. Bank National Association,

                Defendant.


        Alf E. Sivertson, Esq., Sivertson & Barrette, P.A., 1465
        Arcade Street, St. Paul, MN 55106, counsel for plaintiff.

        David A. Schooler, Esq., Michael C. Wilhelm, Esq., and
        Briggs & Morgan, P.A., 80 South Eighth Street, Suite
        2200, Minneapolis, MN 55402, counsel for defendant.



        This matter is before the court upon the motion for summary
judgment by defendant U.S. Bank National Association (U.S. Bank).
Based on a review of the file, record and proceedings herein, and
for the following reasons, the court grants the motion.


                            **BACKGROUND**

        This employment action arises out of the termination of
plaintiff Patrick Dinsmore by U.S. Bank on August 21, 2007.[1]
Dinsmore began as an items-processing supervisor at U.S. Bank in
2002.  In 2005, he transferred to a different department and became
an account-reconciliation manager.  He received positive reviews in

---

        [1] U.S. Bank is a national bank with its home office in Ohio,
and Dinsmore is a citizen of Minnesota.  See Notice of Removal ¶ 5.

each position.   In 2006, Dinsmore applied to transfer to the lockbox department as manager of the night shift.   The lockbox department processes payments between businesses, and Dinsmore worked in a lockbox department at a previous bank.   Lockbox-department supervisor RaNal Gleason interviewed Dinsmore.   Gleason described the turnover in the department and told Dinsmore that one night-shift employee was problematic.

Dinsmore became the night-shift manager in the lockbox department in June 2006.   He soon became dissatisfied and decided that "Gleason had misrepresented the shift supervisor position" based on the number of staff openings and the behavior of the problematic employee.   Pl.'s Mem. Opp'n 5.   On September 1, 2006, Dinsmore sent an email with the subject line "shocking" to his former account-reconciliation supervisor Tracy Strantz.   Dinsmore said that Gleason had intentionally misrepresented department turnover and minimized the problem employee in his interview. Dinsmore Dep. 114:5–115:12, 116:15–25; Yoch Aff. Ex. 2.   Dinsmore told Strantz that he might report Gleason for misrepresenting the job and that he wanted to transfer out of the department.   Yoch Aff. Ex. 2.   In a following email, he stated that "[m]y own personal ethics are such that I will not continue working for someone who has to willfully deceive, intentionally mislead, or obtain services under false-pretenses" and that "this is precisely why I left item processing, because Shannon Rumpca lied through her

teeth to me for several months and I called her on the carpet for it." Dinsmore Dep. 119:9-121:9; Yoch Aff. Ex. 3.

U.S. Bank policy requires employees to wait twelve months after taking a new position before transferring, unless granted special approval. Dinsmore Dep. 111:16-25. In September 2006, Dinsmore met with Mayko Moline in human resources, who told him that early transfer might be an option. Id. at 113:7-10. Dinsmore then met with Gleason, and told her that his "tenure in lockbox would be limited to the 12 month commitment that is associated with job acceptance." See Moline Aff. Ex. 1; Dinsmore Dep. 122:15-23. Gleason said that she would allow him to transfer before the requisite 12 months had elapsed. By this time, Gleason had provided Dinsmore "at least several, two to five feedback sessions of [sic] how [he] was doing." Dinsmore Dep. 128:18-20.

Thereafter, on October 26, 2006, Dinsmore told Gleason that U.S. Bank defers processing checks for nonparty C.H. Robinson. See Wilhelm Aff. Ex. 4. In general, the lockbox department processes checks on the same day they arrive, however, U.S. Bank regularly defers processing checks for C.H. Robinson. According to Dinsmore, when C.H. Robinson representatives visited the department, Gleason or the day-shift manager would tell staff to hide C.H. Robinson checks, because U.S. Bank earns money by holding the checks.[2]

---

[2] Dinsmore offers no admissible evidence in support of these assertions. The "Statement of Rebecca Feiner" is an ex parte
(continued...)

In December 2006, Dinsmore applied to transfer back to account reconciliation. Moline[3] told him that she was concerned about the frustrations that led to his previous transfer, questioned his desire to return to that department and told him that his rapid transfers raised concern.   <u>See</u> Moline Aff. Ex. 2.   Strantz indicated that he had "burn[ed] several career bridges here at U.S. Bank" and as a result, she would not consider him to return to work in account reconciliation.  <u>Id.</u>; Dinsmore Dep. 152:24-153:10.  U.S. Bank awarded the job to another applicant.

Dinsmore then applied in the items-processing department. U.S. Bank told him that he could not apply for a position in that department, because he had "burned bridges" in that department by making unfavorable comments about the supervisor, Shannon Rumpca. Dinsmore Dep. 148:23-149:7.  U.S. Bank then told Dinsmore that he would need to remain in a position for some time to "put down grassroots," which would mean working in the lockbox department for three to four years before transferring.  <u>Id.</u> at 163:9-24.

_____

[2](...continued)
deposition: Feiner testified under oath in response to the questioning of Dinsmore's counsel. <u>See</u> Sivertson Aff. Ex. 6.  This deposition was taken on November 10, 2010, two days before Dinsmore's response brief was due, and well past the discovery deadline.  Dinsmore did not serve notice under Rule 30(b)(1). Therefore, the court does not consider this statement.  Even if it were to consider the Feiner statement, much of the statement is inadmissable hearsay, and it would have no effect on the disposition of the present motion.

[3] U.S. Bank disputes this meeting, and asserts that Dinsmore met with Tracy Strantz.  <u>See</u> Moline Aff. ¶ 4.

In January 2007, Gleason asked Dinsmore if he were going to prepare his 2006 performance review or if he wanted her to do it. Dinsmore Dep. 251:14-16.  Dinsmore told her to write the review. Id. at 251:17-18.  Around this same time, Dinsmore made numerous errors in the payroll records for his shift.  See Gleason Aff. Ex. 6, at 75, 78, 80, 84, 91, 92.

In the first week of February 2007, a lockbox employee, Sue Vang, told Dinsmore that employees in the first shift were not being given lunch breaks.  Dinsmore Dep. 261:21-262:13.  Within days, Dinsmore reported the alleged violation to Gleason.  Id. at 269:22:25.  Gleason told him that the practice was not a violation of law.  Id. at 279:11-19.

In March 2007, Gleason's performance review characterized Dinsmore's work as "not consistently meeting expectations." Dinsmore objected, calling the review negative and inaccurate. According to Dinsmore, Gleason asked, "So are you going to quit now?"  Dinsmore Dep. 160:23-25.  Throughout 2006, Gleason gave Dinsmore critical feedback about his work.  Dinsmore Dep. 249:10-15; 250:5-11.

On May 22, 2006, Gleason placed Dinsmore on a performance improvement plan.  Thereafter, Dinsmore told human resources generalist Kimberly Yoch that Gleason was retaliating against him "after I brought to her attention that Sheila O'Connor was exhibiting inappropriate behavior that I specifically described as

'harassing the staff' last fall.  [Gleason] didn't appreciate my attempts to reprimand Shelia, nor my speaking with HR about other issues that we disagreed on."  Yoch Aff. Ex. 10.  He later told Yoch that Gleason was retaliating against him for reporting the perceived deferred-processing and lunch-break issues.  In July 2007, Gleason amended and extended the performance improvement plan, noting continuing deficiencies and Dinsmore's questions about deferred processing and meal breaks.  In August 2007, U.S. Bank terminated Dinsmore.

Dinsmore sued U.S. Bank in Minnesota state court, claiming retaliation in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932.  U.S. Bank timely removed, and moved for summary judgment.  The court now considers the motion.

## DISCUSSION

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);[4] see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of

---

[4] The court cites the Federal Rules of Civil Procedure in effect at the time of the motions and hearing.  Changes effective December 1, 2010, do not affect the outcome of this case.

the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  A dispute is genuine if the evidence is such that it could
cause a reasonable jury to return a verdict for either party.  See
id. at 252.

On a motion for summary judgment, the court views all evidence
and inferences in a light most favorable to the nonmoving party.
See id. at 255.  The nonmoving party, however, may not rest upon
mere denials or allegations in the pleadings but must set forth
specific facts sufficient to raise a genuine issue for trial.  See
Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support
each essential element of his claim, the court must grant summary
judgment because a complete failure of proof regarding an essential
element necessarily renders all other facts immaterial.  Id. at
322-23.

## II.  Minnesota Whistleblower Act

Minnesota's Whistleblower Act protects "disclosures made by
neutral parties who report violations of the law for the public
good."  Kidwell v. Sybaritic, Inc., 784 N.W.2d 220, 228 (Minn.
2010) (citation omitted).  The court analyzes whistleblower claims
under the burden-shifting framework of McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802-04 (1973).  See Chial v. Sprint/United
Mgmt. Co., 569 F.3d 850, 854 (8th Cir. 2009).

Under McDonnell Douglas, a plaintiff must first establish a
prima facie case.  Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010

7

(8th Cir. 2005). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. If the employer puts forth such a reason, the plaintiff then must produce evidence demonstrating that the employer's reason is pretext for unlawful retaliation. Id. To establish a prima facie case of retaliation under the Whistleblower Act, a plaintiff must show that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action and (3) there is a causal connection between the two. See Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)).

An employee engages in protected conduct when "the employee ... in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer ...." Minn. Stat. § 181.932, subdiv. 1(1). To constitute good faith, an employee must make the report "for the purpose of exposing an illegality" rather than some other purpose. Chial, 569 F.3d at 854 (quoting Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000); see also Kidwell, 784 N.W.2d at 227. The court must consider:

> the reporter's purpose at the time the reports were made, not after subsequent events have transpired...to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing

> an illegality and not a vehicle, identified
> after the fact, to support a belated
> whistle-blowing claim.

Chial, 569 F.3d at 854 (quoting Obst, 614 at 202).

### A.   Statutorily Protected Conduct

U.S. Bank first argues that the deferred-processing and meal-break reports are not reports of violations of law. Dinsmore argues that he need only have a "good faith suspicion of violation of a law." The Minnesota Supreme Court has rejected Dinsmore's argument. See Kratzer v. Welsh Cos., 771 N.W.2d 14, 23 (Minn. 2009) (finding view that Whistleblower Act is implicated when "employee's belief that a law was violated was held in good faith" to be "simply wrong"). The conduct reported — assuming it occurred — must violate a federal or state law. Id. at 22–23. The court avoids construing the Whistleblower Act too broadly, and must keep in mind that "a mere report of behavior that is problematic or even reprehensible, but not a violation of the law, is not protected conduct under the Whistleblower Act." Id. (citations omitted).

In this case, neither of Dinsmore's reports concerned conduct in violation of the law. The large-deposit exception of 12 C.F.R. § 229.13(b) exempts the deferred processing of C.H. Robinson checks. See also 12 U.S.C. § 4003(b). As to meal breaks, employers must "permit each employee who is working for eight or more consecutive hours sufficient time to eat a meal." Minn. Stat. § 177.254. Dinsmore states that Vang's complaint concerned

9

employees who took their lunch break at the end of their shift and, as a result, left work early.  Dinsmore Dep. 280:19–281:19.  This does not violate § 177.254; an employer need not force its employees to take a meal break.  Dinsmore further states that he had no knowledge of U.S. Bank denying a meal break.  Id. at 271:13–19, 273:18–21.  Therefore, Dinsmore fails to show that he reported a violation or suspected violation of law, and his prima facie showing fails on this basis alone.

Further, even if the actions reported were violations of law, Dinsmore's claims also fail because his reports were not made to expose illegality.  Reports made in fulfillment of job obligations may constitute protected conduct.  Kidwell, 784 N.W.2d at 226–27.  An employee's assigned job duties are relevant, however, in considering whether a report is made "to expose an illegality." See id. at 229–30.

Dinsmore's role as manager was to "ensure[] compliance with applicable laws and regulations."  See Gleason Aff., Ex. 1, at 1. As a result, his deferred-processing and meal-break reports fall within the express scope of his job duties.  See Kidwell. 229–30 (holding email describing dishonest practices of company by employee charged with "providing advice on any legal affairs of company" was to carry out job duties); see also Skare v. Extendicare Health Servs., Inc., 515 F.3d 836, 841 (8th Cir. 2008)

("The whistleblower statute does not grant protection to an employee whose job duties require him or her to ensure legal compliance.").

Nothing in the record suggests that Dinsmore made his reports for any reason other than performance of his assigned duties. Indeed, Dinsmore's statement that he wanted to "remove this situation from ever seeing the light of day or going into a legal process" is inconsistent with an attempt to expose illegality. Moreover, the timing of the reports — following his expressed dissatisfaction with the lockbox department — undermine his assertion that the reports were made to expose illegality. Therefore, Dinsmore fails to show that he engaged in protected conduct, and summary judgment is warranted.

**B.   Causal Connection**

The claim also fails even if Dinsmore engaged in protected conduct, because no evidence supports a causal connection between his protected conduct and the actions of U.S. Bank.  A short interval between protected conduct and an adverse employment action "may occasionally raise an inference of causation," but, "in general, more than a temporal connection is required." Freeman v. Ace Tel. Ass'n, 467 F.3d 695, 697–98 (8th Cir. 2007) (interval of two to three weeks insufficient).

The intervals between Dinsmore's October 2006 deferred-processing reports or his February and June 2007 meal-break reports

and the March 2007 performance review, May 2007 performance-improvement plan, July 2007 extension of the plan and August 2007 termination are insufficient to raise an inference of a causal connection.[5]   Moreover, U.S. Bank presents evidence of several intervening performance problems, including several payroll errors, failing to appear to interview an applicant, removing documents from another supervisor's desk and speaking disparagingly about Gleason to subordinate employees.   See Dinsmore Dep. 224:4-226:11, 227:19-228:1, 315:1-12; see also Gleason Aff. Ex. 6, at 75, 78, 80, 84, 91, 92; id. Exs. 9-11, 15.   These acts all negate any inference of a causal connection.   Therefore, for this additional reason, Dinsmore fails to make a prima facie showing, and summary judgment is warranted.[6]

---

[5] The failure to award Dinsmore positions in his former departments in January 2007 are not adverse employment actions, and even if they were, the two-month interval between his report — or even the month-long interval between his conversation with other managers — and the alleged actions erodes any inference of causality.

[6] The court notes that even if Dinsmore could make a prima facie showing, his claim would fail at the pretext stage.   U.S. Bank offers legitimate, nonretaliatory reasons for his termination and his performance reviews.   Dinsmore offers no evidence that these reasons are pretextual, and he admits that Gleason identified performance issues well before he ever made a report.   Dinsmore Dep. 128:5-130:16; 249:1-250:11.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 24] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 22, 2011

s/David S. Doty
David S. Doty, Judge
United States District Court